UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **MELINDA DANNELL MURPHY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:12-1193** |
| | ) | **Judge Sharp** |
| **AHF/CENTRAL STATES, INC.** | ) | |
| **D/B/A BELCOURT TERRACE** | ) | |
| **NURSING HOME,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

In this race discrimination, age discrimination, and retaliation case brought by Plaintiff

Melinda Dannell Murphy under Title VII, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human

Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*,[1] Defendant AHF/Central States, Inc.

d/b/a Belcourt Terrace Nursing Home ("Belcourt") has filed a Motion for Summary Judgment

(Docket No. 10).  That Motion has been fully briefed by the parties (Docket Nos. 11, 18 & 29) and,

for the reasons that follow, will be granted.

**I.  FACTUAL BACKGROUND**

While working at Lakeshore Heartland Senior Care Service in the central supply/medical

records section, Plaintiff received a call from Denise Patterson, MDS Coordinator at Belcourt, who

informed her of an open medical records position at Belcourt.  On November 23, 2009, Plaintiff

became Belcourt's Medical Records Coordinator, replacing Phyllis Krnkkle who had been

_____

[1]  In her Complaint, Plaintiff also asserted claims for sex discrimination in violation of both statutes.
However, in her response brief, Plaintiff "concedes her gender discrimination claims[.]" (Docket No. 18 at
1).

1

terminated for poor work performance.[2]  At the time of hiring, Plaintiff was 49 years old.

The Medical Records Coordinator position was part-time, consisting of five hour work days, five days a week. In addition to being responsible for ensuring that medical records were complete and filed appropriately, Belcourt claims Plaintiff was responsible for setting up in-house doctor visits and arranging transportation for patient visits to healthcare providers.[3]  It also claims Plaintiff had responsibilities relating to Medicare certifications and re-certifications ("certs and recerts"), and ICD-9 coding.[4]

When Plaintiff was hired, she reported to Brian Vermillion, Belcourt's Administrator.  The Director of Nursing was Barbara Adkins.

On March 29, 2010, Plaintiff was orally counseled for failing to turn in room check sheets. Such sheets are completed by department heads and indicate whether patients' rooms are clean, properly stocked, and safety alarms are in place.  Plaintiff was not alone in being disciplined for failing to turn in room check sheets in a timely fashion.  Plaintiff signed the Employee Counseling Form and did not write anything on the form in the space provided for "Employee Remarks."

On June 7, 2010, Plaintiff received a written warning for working more than 5 hours, not properly boxing up medical records, and failing to complete transportation paperwork timely and correctly.  Although Mr. Vermillion did not believe that Plaintiff's termination was necessary at this

---

[2]  Ms. Krnkkle, a white female, was 54 years old when she was hired by Belcourt.

[3]  A physician visited the Belcourt facility two times a week.

[4]  "[R]eceipt of Medicare benefits for extended care services is conditioned upon certification and periodic recertification by the patient's doctor that skilled care is medically necessary." Himmler v. Califano, 611 F.2d 137, 140 (6th Cir. 1979).  ICD-9 codes refer "to the International Classification of Diseases, Ninth Revision, Clinical Modification codes, a coding system used to describe the diagnosis or medical condition for which medical services are rendered when Medicare claims are submitted to Medicare carriers." Sikkenga v. Regence Bluecross Blueshield of Utah,  472 F.3d 702, 709 (10th Cir. 2006).

point, he did make this a final written warning because he viewed the violations as severe. Again, Plaintiff signed the Employee Counseling Form acknowledging that she read the disciplinary action and did not place any remarks on the form.

On November 11, 2011, Mr. Vermillion ended his employment with Belcourt to work elsewhere. He was replaced by Luis Jimenez, who became the Interim Administrator.

Shortly after taking the reigns, Mr. Jimenez completed an employee evaluation for Plaintiff. That evaluation, dated November 17, 2011, gave Plaintiff an overall score of 74% (out of a possible 100%), and rated her as "dependable most of the time" in the Dependability category.[5] In the comments section, Mr. Jimenez wrote that as "Administrator [he] "had only a week and a half to know Melinda," and that he would "potentially do another eval early in the [next] year." (Docket No. 13-1 at 36).

However, four days later, and after consultation with Ms. Adkins and Carol Johnson, the Quality Assurance Nurse for American Health Foundation,[6] Mr. Jimenez, in conjunction with Ms. Adkins, performed another evaluation. This time, Plaintiff received an overall score of 60, and was rated as "ordinarily dependable." In the comments section, Mr. Jimenez wrote "MD visits, MD visits to bill, ICD-9 coding, filing, certs dates not right, frequently asks for other's assistance [and] discharge summaries are incomplete and out of compliance." (Docket No. 21-4 at 2).

The day after the November 21, 2011 evaluation, Plaintiff was given an "Employee Counseling Form" that placed her on a 60-day improvement plan. The plan, signed by both Mr.

---

[5] The category for "Dependability" encompasses an employee's absenteeism and tardy rate.

[6] As the person responsible for assessing the quality of care and compliance, Ms. Johnson had previously identified issues with Ms. Murphy's performance as Medical Records Coordinator during her visits to Belcourt.

Jimenez and Ms. Adkins, indicated Plaintiff needed to "improv[e] in the following areas for accuracy, thoroughness and timeliness: MD visits, MD visits to bill, ICD-9 coding, filing certs/re-certs [and] discharge summaries." (Docket No. 13-1 at 32). It also indicated that Plaintiff would be re-educated on "monthly physician visit" and on "the proper way and date to complete recerts and certs." (Id.). Plaintiff was to be "monitored weekly for progress" and was informed that "[i]f all of the issues are not up to par per managment's satisfaction, these will be ground for termination." (Id.). Plaintiff admits signing the form, but claims that she did not write "planning to successfully meet standards," which appeared in the Employee Remarks section.

With the improvement plan in place, Ms. Adkins was made Plaintiff's supervisor because Mr. Jimenez believed Ms. Adkins had a better understanding of medical records. Up until this time, Plaintiff had no day-to-day interaction with Ms. Adkins.

While Plaintiff was under the improvement plan, Mr. Jimenez and Ms. Adkins met with Plaintiff to educate her on her job responsibilities and review the progress she was making regarding the problems outlined in the plan. Nevertheless, on December 9, 2011, Plaintiff received a written counseling for continuing issues with physician visits and ICD-9 coding. Plaintiff was informed that "[f]urther incidents on action plan shall result in further disciplinary action." (Docket No. 13-1 at 21). Plaintiff signed the form, but no remarks appear in the Employee Remarks section.

On January 6, 2012, Ms. Murphy was issued another written counseling for continuing issues related to physician visits. In the "Summary of Violation" section of the Employee Counseling Form, Ms. Adkins wrote:

> Employee is responsible for Dr. visits & Dr. visits for filling. There was [sic] several issues with the physician visits — several missed visits. . . . Dr. visits for billing was better but still missed one (dated 9/11/11).

4

(Docket No. 13-1 at 34). Plaintiff was informed that "further incidents of this nature shall result in further disciplinary action[.]" (Id.). Again, Plaintiff signed the form and did not provide any remarks.[7]

On January 23, 2012, Plaintiff was notified that her employment was terminated because of her failure to improve her performance as required by the 60 day improvement plan. During a termination meeting with Mr. Jimenez and Ms. Adkins, Plaintiff was told that she was still not meeting Belcourt's performance expectations as it related to MD visits, MD visits to bill, ICD-9 coding, filing certs/re-certs, and discharge summaries. Those deficiencies were written on the Employee Termination Form that Plaintiff refused to sign.

Following Plaintiff's termination, Mr. Jimenez hired Hannah Dickens, a 24 year old white female, as Medical Records Coordinator. However, within a week, Ms. Dickens left Belcourt to take a job closer to home.

In March 2012, Mr. Jimenez left his employment to pursue another job opportunity, and Robert Kraft was hired as Administrator. Mr. Craft selected Elaine Embery as Medical Records Coordinator. Ms. Embery, a Certified Nurse Technician had worked at Belcourt since 1994 in both the nursing department and in central supply. At the time of her appointment as Medical Records Coordinator, Ms. Embery was 40 years old.

Plaintiff's termination serves as the basis for her claims of age and race discrimination. Her

---

[7] In response to Defendant's Motion for Summary Judgment, Plaintiff asserts that the "alleged incident (in September) . . . occurred prior to the November 2011 employee performance plan, and prior to Plaintiff's December 2011 counseling," yet neither form mentions "the September 11 incident, which should have been caught at the beginning of October." (Docket No. 19 at 9). She also notes that, on the sheet, someone had changed the date, and asserts that, as a consequence, "Plaintiff had not prevented Belcourt from billing for a physician's visit." (Id.). Who was responsible for the change in dates is not clear. Ms. Adkins claims she asked Plaintiff about the change in date during their meeting on January 6, 2011.

retaliation claim is based on two complaints of alleged sexual harassment by Ms. Adkins.

The first occurred in February 2010, not long after Plaintiff was hired. In that incident, Plaintiff claims that, following the administration of her TB test, she was told by Ms. Adkins that her temperature had to be taken rectally. Plaintiff followed Ms. Adkins to the bathroom in Ms. Adkins's office and, according to Plaintiff, as she began to undo her pants, Ms. Adkins laughed and said she was just kidding.

The second incident occurred in the summer of 2011, after a fire drill. According to Plaintiff, Ms. Adkins informed everyone in the room that the only reason they had passed inspection was because Plaintiff showed her breasts to the fire inspector.

Plaintiff reported the alleged harassment to Mr. Vermillion. She does not know, however, whether Mr. Vermillion discussed the incidents with Ms. Adkins. Ms. Adkins claims that she was not aware that Plaintiff complained to Mr. Vermillion about the incidents.

## II. **APPLICATION OF LAW**

### A. **Standards Governing Summary Judgment**

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox Cnty School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## A. Disparate Treatment – Age and Race Discrimination

"Disparate treatment occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like." Hughley v. Gen. Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995). "To base a claim on disparate treatment, the plaintiff must show discriminatory motive[.]" Id. Where, as here, there is no direct evidence, Plaintiff can attempt to establish her claim utilizing the burden-shifting paradigm of McDonnell Douglas v. Green, 411 U.S. 792 (1973), as refined by Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).[8]

Under the indirect method of proof, Plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a similarly-situated person outside her protected class. See Anthony v. BTR Auto Sealing Sys. Inc., 339 F.3d 506, 514 (6th Cir. 2003); Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002); Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992). "After a plaintiff creates a presumption of discrimination by establishing a *prima facie* case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. Id. Although the burden of production shifts under the McDonnell Douglas/Burdine paradigm, "the ultimate burden of persuading the trier of fact that the defendant

---

[8] The Court notes Plaintiff's claims are brought under both Title VII and the THRA. However, because "[t]he intent of the THRA is to provide for execution within Tennessee of the policies embodied in the federal civil rights statutes," Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006), "THRA claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964," Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) (collecting cases). This includes the McDonnell Douglas burden-shifting framework that the Tennessee legislature codified for all claims filed after June 10, 2010. Tenn. Code Ann. 4–21–311 (2011).

intentionally discriminated against the plaintiff remains at all times with the plaintiff." DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (internal citation omitted).

Defendant argues that Plaintiff's race and age discrimination claims fail at the *prima facie* stage because she cannot show she was qualified for the position of Medical Records Coordinator. After all, "[i]f Plaintiff was qualified for the position she would not have needed educational counseling sessions." (Docket No. 29 at 2). However, the Sixth Circuit has explained that

> At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job. The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are a least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575-76 (6th Cir. 2003).

Given that a plaintiff's burden at the *prima facie* stage is "not intended to be an onerous burden . . . but instead a burden which is easily met," White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008), and given that Plaintiff apparently worked trouble-free for some time after her hiring, the Court will assume for purposes of discussion that Plaintiff was objectively qualified to be Belcourt's Medical Records Coordinator. Nevertheless, Defendant has advanced a legitimate reason for Plaintiff's termination – her failure to improve as required by the improvement plan – and Plaintiff has not shown this reason to be pretextual.

Pretext may be shown by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004). With respect to these avenues of proof, the Sixth Circuit

has stated:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity."

> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or a coverup.

Manzer v. Diamond Shamrock, 29 F.3d 1078, 1084 (6th Cir. 1994); accord Pennington v. Western

Atlas, Inc., 202 F.3d 902 909-10 (6th Cir. 2000)).

In this case, Plaintiff relies on the first and third lines of proof by directly attacking the

credibility of Belcourt's explanation for her termination. In this regard, Plaintiff argues that

Defendant's contention she did not improve is "patently false" because

> [d]uring Plaintiff's unemployment appeals hearing on May 14, 202, Ms. Adkins, *Plaintiff's supervisor*, testified that Ms. Murphy was <u>improving</u> with regard to certifications, recertifications, and discharge summaries. If Plaintiff was improving and had improved on two of the prong of the improvement plan, then there is clearly a question as to the true reason Ms. Murphy was terminated from Belcourt Terrace. The fact that Ms. Murphy was improving does not seem to warrant her termination.

(Docket No. 18 at 16, italics and underlining in original).

As a preliminary matter, Plaintiff's belief about whether her termination was warranted or fair

is irrelevant because "the dispositive question is whether a reasonable factfinder could conclude that the [reasons given] are not sufficient from the employer's perspective to warrant terminating him." Back v. Nestle USA, Inc., 694 F.3d 571, 580 (6th Cir. 2012). Regardless, the fact that Plaintiff may have "improved on two of the prongs of the improvement plan," says nothing about the other perceived deficiencies, including problems relating to MD visits, MD visits to bill, and ICD-9 coding. Plaintiff presents nothing to suggest that she improved in those areas – to the contrary, she was disciplined on December 9, 2011, for continuing issues with physician visits and ICD-9 coding and on January 6, 2012, for continuing issues with physician visits. Moreover, Plaintiff was specifically warned that if management was not satisfied with her improvement in all areas, she could be terminated.

Plaintiff also argues that she was treated differently than her replacement because when she received educational coaching, the sessions "counted *against* her as written warning," (Docket No. 18 at 14-15), but the same was not true with regard to her replacement, Ms. Embery. For at least a couple of reasons, this argument is insufficient to show pretext.

First, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects," Weigel, 302 F.3d at 379, but Plaintiff has not made that showing. She holds herself out to be knowledgeable in the medical records field and had been employed for almost two years as the Medical Records Coordinator when she was required to undergo further training, whereas Ms. Embery was a new hire in the area. It is unclear what experience Ms. Embery had in relation to medical record-keeping but, in any event, Plaintiff has not shown that the education Ms. Embery received when she first started in medical records was similar to Plaintiff's educational sessions while under the performance improvement plan.

Second, Plaintiff's contention that she was treated differently because her counseling sessions were held against her but not Ms. Embery is not borne out by the record. According to Ms. Adkins' unemployment compensation hearing and deposition testimony (which Plaintiff has not disputed by any competent evidence), written records were made of both Plaintiff's and Ms. Embery's counseling sessions to document what was covered, and Ms. Embery's employee file itself has four or five such records. There is no proof that the educational sessions, though documented, "counted against" Plaintiff and served as written warnings.

Plaintiff next asserts that the January 6, 2012 "counseling" is "suspect" because, in it, "Ms. Adkins scrounged up an alleged infraction from *five months earlier*, purportedly a missed physician's visit in September 2011." (Docket No. 16 at 18). She has not, however, shown that this was "scrounged up," or that there was no error with regard to this physician visit or others. The visit in question was listed as 12/11/11, but someone scratched out that date and replaced it with 9/11/11. Even so, according to Ms. Adkins, the actual date of the visit was December 4, 2011, and so regardless of who or why the change was made, the date was incorrectly listed. It is unremarkable that this error was picked up in January 2012.

Interestingly, while Plaintiff sets forth arguments that she claims show pretext, she ignores her deposition testimony that Ms. Adkins "don't like anybody," was "very hard to please, and hard to get along with," that "[p[retty much the entire building would says that [Ms. Adkins] don't like anybody," and that she was "nitpicky," even against at least one white employee (Docket No. 13-1 at 21, 22 & 89), all of which cuts against the notion that Ms. Atkins treated Plaintiff differently because she was black. Also cutting against that notion is that, when Plaintiff was hired, half of the nursing staff (which Ms. Adkins was responsible for hiring) was black, and that Plaintiff was hired to replace a white employee who had been terminated for her work performance.

11

Plaintiff's age discrimination claim is undercut by the fact that she was hired by Belcourt at the age of 49 to replace Ms. Krnkkle who was hired when she was 54. Further, even though a 24 year old took Plaintiff's place for one week, the person who ultimately received the Medical Records Coordinator was 40 years old and in the protected class. This evidence suggest that age was not the reason for Plaintiff's termination.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 120, 143 (2002). Plaintiff simply has not produced sufficient evidence to present a jury question on the issue of whether her termination was the result of age or race discrimination.

## C. Retaliation

In the absence of direct evidence, retaliation claims are also subject to analysis under the McDonnell Douglas/Burdine burden-shifting framework. Plaintiff has the initial burden of establishing the following essential elements: "(1) [s]he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir. 2008).

Plaintiff has not established a *prima facie* case of retaliation. While she conclusorily asserts that "Defendant knew of" her protected activity (Docket No. 18 at 18), the essence of her retaliation claims is that, after Ms. Adkins became Plaintiff's supervisor, there was a "flurry of discipline" for which "Plaintiff was terminated two months later," and that "[i]t took Adkins just two weeks to

influence [Mr. Jimenez] to place Plaintiff on a performance improvement plan." (Id. at 15). But there is no evidence that Ms. Adkins knew that Plaintiff had complained about the TB-test or fire drill incidents. It is unclear how Ms. Adkins could have been bent on retaliating against Plaintiff, particularly since Ms. Adkins claims she did not know Plaintiff complained to Mr. Vermillion.

Regardless, Defendant has provided legitimate reasons for its decision to terminate Plaintiff. In response, Plaintiff relies upon the temporal proximity between her last complaint to show pretext, and argues that she need only show that retaliation was a motivating factor in her termination. Both assertions are incorrect.

First, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." Donald v. Sybra, Inc., 667 F.3d 757, 763 (6th Cir. 2012); see also Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 284 (6th Cir. 2012) (citation omitted) . That is, "'temporal proximity alone will not support an inference or retaliatory discrimination when there is no other compelling evidence.'" Imwall v. Reliance Med. Prod., Inc., 515 F.3d 531, 550 (6th Cir. 2008) (quoting Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000).

Second, "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013).[9] "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. While Plaintiff asserts that she "has presented compelling direct evidence of retaliation such that the Nassar

---

[9] Section 2000-2(m) provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

decision is not even relevant," (Docket No. 18 at 20), Plaintiff never identifies that evidence, and the Court has located no direct evidence in its review of the file.

Regardless, Plaintiff argues that she "has put forth evidence that other employees, supervised by Barbara Adkins, received educational coachings, just as Plaintiff did but with no discipline levied against them let alone termination." (Docket No. 18 at 20). Presumably, the "other employees" is a reference to Ms. Embery, but as already discussed, there is no evidence that she and Plaintiff were similarly situated, or that they were treated differently in relation to their educational counseling sessions.

### III. CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment will be granted, and an appropriate Order will be entered dismissing of this case.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE